Zaven A. Sargsian (#14776)
**BUCHALTER**
**A Professional Corporation**
60 E. South Temple, Suite 1200
Salt Lake City, UT  84111
Tel.: 801-401-8625
Email:  zsargsian@buchalter.com

*Attorney for Plaintiff U.S. Ling Institute, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| U.S. LING INSTITUTE, INC., a Utah corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>KPCA NORTHWESTERN PRESBYTERIAN THEOLOGICAL SEMINARY, a Washington non-profit corporation,<br><br>       Defendant. | **COMPLAINT**<br><br>Case No: 2:24-cv-00911<br><br>Hon. Judge _____<br><br>**(JURY DEMANDED)** |

Plaintiff U.S. Ling Institute, Inc. ("U.S. Ling"), through its undersigned counsel, hereby complains against Defendant KPCA Northwestern Presbyterian Theological Seminary ("KPCA"), and alleges as follows:

### NATURE OF ACTION

1.     U.S. Ling is a long-standing English language school located in Utah, and has been operating since 2001. It not only offers its language learning services to local students but also international students that desire to learn English in the U.S. As a language school, U.S.

Ling is authorized by U.S. Citizenship and Immigration Services (USCIS) to admit international students who have been issued a nonimmigrant F-1 visa.

2.       Nonimmigrant students granted an F-1 visa must come directly to U.S. Ling and pursue a "full course of study," which at U.S. Ling is 18 credit hours per semester (or equal to 18 in-person class hours per week). While U.S. Ling's students have the flexibility to attend morning or evening classes, all attendance is in person. In-person attendance has been the law and the norm in the education industry accepting F-1 students since at least 2002. Under 8 C.F.R. § 214.2(f)(6)(i), only three credit hours of online learning per semester may be counted towards the "full course of study" requirement. The primary logic of the rule is simple: if students are permitted to take a full course of study online, then there is no need for them to be in the U.S. Moreover, physical attendance allows U.S. SEVP-accredited schools (those that can issue an I-20, such as U.S. Ling) to monitor and track the location of the nonimmigrant students.

3.       In violation of U.S. law and industry custom and practice, defendant KPCA (a seminary of the Korean Presbyterian Church in Abroad), has been recruiting F-1 students to transfer to their school, *not* to attend classes at KPCA's physical space in Washington state, but to take *online classes* for a Bachelor's in Biblical Studies. In reality, KPCA requires these F-1 students to pay thousands of dollars a year so students can watch 50-minute pre-recorded classes and submit a summary of those videos at the end of each week.

4.       KPCA has convinced thousands of F-1 students attending English language schools in the U.S.—including 37 Brazilian students from U.S. Ling (in 2024 alone)—to transfer to KPCA. And F-1 students have rushed to transfer. Not because these students have mastered the English language and are now interested in biblical studies directed by a Korean Presbyterian

seminary, but because KPCA's 50-minute pre-recorded online classes allow students to work throughout the day—which is not allowed under an F-1 visa—and also avoid academic rigor. In short, KPCA has been using improper means to interfere with U.S. Ling's economic relations with F-1 students. In the process, U.S. Ling has suffered hundreds of thousands in damages and the immigration status of countless F-1 students has been put in jeopardy by KPCA.

## PARTIES/ JURISDICTION/ VENUE

5.      U.S. Ling is a Utah corporation, with its principal place of business located in Salt Lake County, Utah.

6.      KPCA is a Washington nonprofit corporation, with its principal place of business in King County, Washington.

7.      Jong Taek Chung, a non-party to this action, is KPCA's Office Administrator and Designated School Official, and has held that position at all times relevant to this action.

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy is greater than $75,000.00.

9.      Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2)-(3).

## FACTUAL ALLEGATIONS

*(i)*      ***The Legal Framework Regulating The Admission of Nonimmigrant Students***

10.      The Immigration and Nationality Act ("INA" or the "Act") is the primary body of law governing immigration and visa operations, and the admission of various classes of

nonimmigrants to the U.S., including foreign students.[1]

11.     An F-1 nonimmigrant, as defined in section 101(a)(15)(F) of the Act,[2] is an "alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursing such a course of study consistent with section 1184(l)[3] of this title at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States . . . ."  8 U.S.C. § 1101(a)(15)(F)(i).

12.     Prior to September 11, 2001, the Immigration and Naturalization Service (INS) was responsible for administering and enforcing the immigration laws. Following the tragic events of September 11, 2001, "[t]he emphasis of American immigration law enforcement became border security and removing criminal aliens to protect the nation from terrorist attacks."[4]

13.     Among the fall-out from the tragic 9/11 attack on the U.S., was renewed political attention and scrutiny on nonimmigrant student visas.[5] A year prior to the 9/11 attack, on September 25, 2000, one of the 9/11 terrorists, Hani Hanjour, submitted an application in Saudi

---

[1] Regulation and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS), 67 Fed. Reg. 34862 (proposed May 16, 2002), https://www.govinfo.gov/content/pkg/FR-2002-05-16/pdf/02-12022.pdf.
[2] The Act was renumbered in the U.S. Code as 8 U.S.C. § 1101, *et seq*.
[3] Section 1184(l) was redesignated in 2000 as section 1181(m).
[4] *Overview of INS History* at 11, USCIS History Office and Library (2012), https://www.uscis.gov/sites/default/files/document/fact-sheets/INSHistory.pdf.
[5] Robert Farley, *9/11 Hijackers and Student Visas*, FACTCHECK.ORG (May 10, 2013), https://www.factcheck.org/2013/05/911-hijackers-and-student-visas/.

Arabia for a student visa.[6] Hanjour stated a desire to attend an ELS Language Center in Oakland, California.[7] On December 8, 2000, Hanjour entered the U.S., yet he never attended the ELS Language Center school in Oakland, California—the stated destination on his visa application.[8] Instead, on December 8, 2000, Hanjour traveled to San Diego where he joined another 9/11 attacker, Nawaf al Hazmi.[9] Hanjour and Hazmi then immediately left for Arizona, where Hanjour took aviation classes, and in March 2001, Hanjour and Hazmi drove east, ultimately settling in Falls Church, Virginia.[10]

14.     In 2002, as part of reforms following the 9/11 attacks, INS amended its regulations governing the retention and reporting of information regarding various classes of nonimmigrants, including F-1 students.[11] Among other things, the new regulations implemented the Student and Exchange Visitor Information System (SEVIS), and established a process for electronic reporting by designated school officials (DSOs) of information.

15.     Also, the Homeland Security Act of 2002 disbanded INS on March 1, 2003, and its constituent parts contributed to three new federal agencies under the newly-formed Department of Homeland Security (DHS): (1) Customs and Border Protection (CBP); (2) Immigration and Customs Enforcement (ICE); and (3) U.S. Citizenship and Immigration Services (USCIS).

---

[6] Eldridge, *et al.*, *9/11 and Terrorist Travel, Staff Report of the National Commission on Terrorist Attacks Upon the U.S.* at 13, Nat'l Comm. On Terrorist Attacks Upon the U.S. (Aug. 21, 2004), https://govinfo.library.unt.edu/911/staff_statements/911_TerrTrav_Monograph.pdf.
[7] *Id.*
[8] *Id.* at 17.
[9] *The 9/11 Commission Report* at 226, Nat'l Comm. On Terrorist Attacks Upon the U.S., https://www.9-11commission.gov/report/911Report.pdf.
[10] *Id.* at 226-27.
[11] *See supra* note 1.

BN 85820171v16

16.     DHS also created the Student and Exchange Visitor Program (SEVP) that was in charge of administering SEVIS. SEVP was established as part of the Homeland Security Investigations (HIS) National Security Investigations Division (NSID) within ICE.[12] "SEVP oversees the certification of academic and vocational schools to allow enrollment of foreign nationals seeking entry into the U.S. as nonimmigrant students under F classes of admission, and also tracks and manages real-time information about F/M/J nonimmigrant students, their dependents, and the schools and sponsors that host those nonimmigrants, to ensure compliance with immigration laws and regulations."[13]

17.     The DHS (formerly INS) and its components carry out their agenda by issuing regulations. Thus, USCIS and ICE issue regulations affecting F-1 students and SEVP-certified academic institutions.[14]

18.     Relevant to this dispute, 8 C.F.R. § 214.2(f) concerns "*Students in colleges, universities, seminaries, conservatories, academic high schools, elementary schools, other academic institutions, and in language training programs*."

19.     Under section 214.2(f)(1), "[a] nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(F) of the Act, if" the student meets certain requirements including "present[ing] a Form I-20 or successor form issued in the

---

[12] DHS/ICE/PIA – 001 Student and Exchange Visitor Program (SEVP), Homeland Security (last updated Nov. 30, 2023), https://www.dhs.gov/publication/dhsicepia-001-student-exchange-visitor-information-system-sevis.
[13] *Id.*
[14] DHS Rulemaking, Homeland Security (last updated May 10, 2023), https://www.dhs.gov/dhs-rulemaking#:~:text=The%20DHS%20regulatory%20agenda%20includes,U.S.%20Coast%20Guard%20(USCG).

BN 85820171v16

student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i).

20.     Nonimmigrant students holding an F-1 visa are admitted into the U.S. for an unspecified period of time to engage in activities authorized under the nonimmigration classification (in this case, the F classification).[15] This unspecified period of time is referred to as "duration of status."

21.     Under section 214.2(f)(5), "[d]uration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students . . . . The student is considered to be maintaining status if the student is making normal progress toward completing a course of study." 8 C.F.R. § 214.2(f)(5)(i).

22.     Importantly, section 214.2(f)(6)(i)(A) through (E) define "full course of study," in part, based on the type of SEVP-certified academic institution:

(6) *Full course of study* –

    i.    **General**. Successful completion of the full course of study must lead to the attainment of a specific educational or professional objective. A course of study at an institution not certified for attendance by foreign students as provided in § 214.3(a)(3) does not satisfy the requirement of this paragraph (f)(6)(i). A "full course of study" as required by section 101(a)(15)(F)(i) of the Act means:

    (A)    Postgraduate study or postdoctoral study at a college or university, or undergraduate or postgraduate study at a conservatory or religious seminary, certified by a DSO as a full course of study;

---

[15] Policy Manual at Ch.8(A)(2), USCIS (Nov. 26, 2024), https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-8.

BN 85820171v16

(B)    Undergraduate study at a college or university, certified by a school official to consist of at least 12 semester or quarter hours of instruction per academic term in those institutions using standard semester, trimester, or quarter hour systems, where all undergraduate students who are enrolled for a minimum of 12 semester or quarter hours are charged full-time tuition or are considered full-time for other administrative purposes, or its equivalent (as determined by SEVP in the school certification process), except when the student needs a lesser course load to complete the course of study during the current term;

(C)    Study in a postsecondary language, liberal arts, fine arts, or other non-vocational program at a school which confers upon its graduates recognized associate or other degrees or has established that its credits have been and are accepted unconditionally by at least three other institutions of higher learning which are either:

    (1)    A school (or school system) owned and operated as a public educational institution by the United States or a State or political subdivision thereof; or

    (2)    A school accredited by a nationally recognized accrediting body; and which has been certified by a designated school official to consist of at least 12 clock hours of instruction a week, or its equivalent as determined by SEVP in the school certification process;

(D)    Study in any other language, liberal arts, fine arts, or other nonvocational training program, certified by a designated school official to consist of at least eighteen clock hours of attendance a week if the dominant part of the course of study consists of classroom instruction, or to consist of at least twenty-two clock hours a week if the dominant part of the course of study consists of laboratory work; or

(E)    Study in a curriculum at a certified private elementary or middle school or public or private academic high school which is certified by a designated school official to consist of class attendance for not less than the minimum number of hours a week prescribed by the school for normal progress toward graduation.

       *      *      *

8

23.     On May 16, 2002, the legacy INS provided notice of a proposed rule amendment
to section 214.2, including implementing SEVIS and amendments to the regulations surrounding
"full course of study."[16]

24.     Specifically, the proposed rule added subsection (G) to section 214.2(f)(6)(i),
which addressed online and distance education learning by F-1 students. That proposed new
subsection (G) stated as follows:

> (G)  For F-1 students enrolled in classes for credit or classroom hours,
> no more than the equivalent of one class or three credits per
> session, term, semester, trimester, or quarter may be counted
> toward the full course of student requirement if the class is taken
> on-line or through distance education and does not require the
> student's physical attendance for classes, examination or other
> purposes integral to completion of the class. An on-line or distance
> education course is a course that is offered principally through the
> use of television, audio, or computer transmission including open
> broadcast, closed circuit, cable, microwave, or satellite, audio
> conferencing, or computer conferencing. If the F-1 student's course
> of study is in a language study program, no on-line or distance
> education classes may be considered to count toward a student's
> full course of study requirement.

25.     Legacy INS explained the logic for the proposed rule as follows:

> *How Does This Rule Address Distance Education or On-Line*
> *Programs?*
>
>          While on-line and distance education programs
> can be highly innovative means to augment or even
> conduct an educational program, the entry of a foreign
> student into the United States becomes unnecessary if the
> bulk of the program does not require the student's
> physical presence. Therefore, this rule proposes to limit
> the enrollment of F-1 and M-1 students in courses that are
> on-line or through distance education programs and do
> not require the student's actual presence. The rule also
> provides a definition of on-line courses and distance

---

[16] *See supra* note 1.

BN 85820171v16

education programs that is similar to a definition provided by the Department of Education for telecommunications courses.

Under proposed § 214.2(f)(6)(i)(F), those students for whom on-line or distance education credits can be counted toward the obligation to maintain a full course of study will be limited to counting one class or three credits per semester toward the obligation, provided that the class is accepted for credit at the school that the student is currently attending. No on-line or distance education classes taken by an M-1 student, or by an F-1 student in a language program or elementary or secondary school program, can be counted as being part of the student's full course of study, given the limited duration or focus of those programs.

26.     Title 34 of the C.F.R (Education), and 34 C.F.R. § 600.2 does not define "on-line" or "online" learning, but defines "Distance education" to mean "(1) [e]ducation that uses one or more of the technologies listed in paragraphs (2)(i) through (iv) . . . to deliver instruction to students who are separated from the instructor or instructors and to support regular and substantive interaction between the students and the instructor or instructors, either synchronously or asynchronously. (2) The technologies that may be used to offer distance education include –

  (i)   The internet;

  (ii)  One-way and two-way transmissions through open broadcast, closed circuit, cable, microwave, broadband lines, fiber optics, satellite, or wireless communications devices;

  (iii) Audio conference; or

  (iv)  Other media used in a course in conjunction with any of the technologies listed in paragraphs (2)(i) through (iii) of this definition.

27.     On December 11, 2002, legacy INS adopted the Final Rule amending section 214.2(f)(6)(i) to add subsection (G).

10

28.     USCIS has a Policy Manual that is the "agency's centralized online repository for USCIS' immigration policies."[17] The Policy Manual "contains the official policies of USCIS and assists immigration officers in rendering decisions. The Policy Manual is to be followed by all USCIS officers in the performance of their duties . . . ."[18]  USCIS has interpreted section 214.2(f)(6)(i)(G) to apply the three-credit limitation to (1) online, and separately to (2) distance education that does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class.

29.     Specifically, the USCIS Policy Manual provides guidance regarding "Online and Distance Education Courses"[19] as follows:

> An F-1 student enrolled in classes for credit or classroom hours may only count one class or three credits (or the equivalent) per academic session (or the equivalent) toward the full course of study requirement if the class is:
>
> - Taken online; or
> - Through distance education not requiring physical attendance for any purpose integral to completion of the class.
>
> If the F-1 student's course of study is in a language study program, no online or distance education classes count toward a student's full course of study program. If the F-1 student needs only one course to finish the program of study, it cannot be taken through online or distance education. Courses must have a physical presence requirement.[20]

30.     In addition to section 214.2(f)(i)(6)(G) and the USCIS Policy Manual, industry custom and practice relating to admission of F-1 students is to refrain from offering F-1 students online courses beyond three credits per semester. As discussed below, U.S. Ling is aware of no

---

[17] Policy Manual, USCIS (current as of Nov. 26, 2024), https://www.uscis.gov/policy-manual.
[18] *Id.* at About the Policy Manual.
[19] *Id.* at Ch.3(B)(1), https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-3.
[20] *Id.*

BN 85820171v16

instance, besides KPCA, that has admitted F-1 students for classes that are online (beyond the three credits that are permitted under section 214.2(f)(i)(6)(G)).

> ### *ii.*      *U.S. Ling Institute Is a Long-Standing Language School in Utah*

31.      U.S. Ling is an English as a Second Language (ESL) school located at 4516 S. 700 E., Suite 265, Murray, Utah 84107.

32.      U.S. Ling has been operating in Utah since around August 1, 2001.

33.      U.S. Ling provides various English-language programs, and is SEVP-certified to admit F-1 nonimmigrant students.

34.      U.S. Ling has an admissions process that consists of the following:

      a.   Interested applicants apply to U.S. Ling online through U.S. Ling's website.

      b.   Prospective F-1 student applicants must provide significant financial and personal information so U.S. Ling can assess the applicant's financial ability to live in the U.S. during the student's period of studies. Students provide documents to show what funds they have available to them, and, in some instances, have to provide an affidavit of support from an individual guaranteeing the student financial assistance and support.

35.      If the applicant is accepted, U.S. Ling sends the applicant an acceptance letter.

36.      If the admitted student is a nonimmigrant, U.S. Ling then generates a form I-20 for the student.

37.      Once the nonimmigrant student has the I-20, the student can apply for an F-1 visa with USCIS, and USCIS decides whether to grant or deny the F-1 visa application. If the F-1 visa is granted, the nonimmigrant student may enter the U.S.

BN 85820171v16

38.     Prior to registering for classes at U.S. Ling (and paying tuition), the admitted student must take a placement test.

39.     Once the student takes the placement test, the student must review and sign U.S. Ling's Enrollment Agreement, which includes terms related to tuition payments, school fees, emergent circumstances, cancellation and refunds, withdrawals and termination, and so forth.

40.     Tuition at U.S. Ling is approximately $1,800.00 per semester.

41.     U.S. Ling students must be enrolled in a minimum of 18 credit hours each semester, which is the equivalent of 18 in-person class hours per week. U.S. Ling offers its students the option of attending either an AM session or PM session. The AM session is four days per week, 9 a.m. to 1:30 p.m. The PM session is also four days per week, 5 p.m. to 9:30 p.m.

42.     While U.S. Ling provides for morning and evening classes, all of U.S. Ling's students are required to attend in person, and U.S. Ling has an attendance policy requiring students to "attend at least 80% of class hours per session."

43.     Thus, all of U.S. Ling's F-1 students must be physically present in the state of Utah. Moreover, any students who do not maintain attendance policy will be dismissed from the school and their F-1 status terminated pursuant to SEVP guidelines.

44.     U.S. Ling has F-1 students from numerous countries, but a significant portion of those students holding an F-1 visa attending U.S. Ling are from Brazil.

45.     To accommodate the Brazilian students, many of U.S. Ling's instructors and office administration speak Portuguese, in addition to English and Spanish.

### iii.     _KPCA Is a Washington School Offering a Bachelor's in Biblical Studies_

46.     Defendant KPCA North Western Presbyterian Theological Seminary (KPCA) is a Washington registered non-profit corporation and a 501(c)(3).

47.     According to KPCA, it is "a denominational seminary of the Korean Presbyterian Church in Abroad . . . ."[21] The Korean Presbyterian Church Abroad, f/k/a Korean Presbyterian Church in America, is an independent Presbyterian denomination.

48.     KPCA's campus and principal place of business is located at 17529 15th Avenue, NE, Shoreline, WA 98155, which it allegedly rents from the property owner, Bethel Lutheran Church of Shoreline. Here is a snippet of KPCA's "campus" from Google Maps:



49.     KPCA claims to have an exemption under Washington law. It states on its website:

---

[21] KPCA Northwestern Presbyterian Theological Seminary, WebArchive (last visited Nov. 12, 2024), https://web.archive.org/web/20240927223510/https://www.nwpts.org/.

The Washington Student Achievement Council has determined that KPCA Northwestern Presbyterian Theological Seminary qualifies for religious exempt status from the Degree-Granting Institutions Act for the following programs: Bachelor of Biblical Studies (B.B.S.) and Master of Divinity (M.Div.).[22]

50.     Based on KPCA's website, it has only two program offerings: a Bachelor of

Biblical Studies (B.B.S.) and a Master of Divinity.[23]

51.     KPCA's Catalog (2022-2023) provides that "unit of credit" is a "semester-hour,"

and a "semester-hour consists of a one 50-minute class session per week."[24] Moreover,

"[s]ixteen-semester-hours is a normal academic load per semester."[25]

52.     KPCA's requirements for a B.B.S. is 128 credit units, and includes the

following:[26]

**Required Credit Unit for Graduation:**

1. General Studies: (36 units)
2. Biblical/Theological Studies: (39 units)
3. Professional Education: (24 units)
4. Electives: (15 units)
5. Concentration: (12 units)
6. Student Ministry with Field Work: (2 units)
   **Total: 128 Units**

53.     KPCA's Catalog says nothing about online or remote classes, or distance

education.[27] But in court filings, KPCA claims that it "provides one fully online course for its

---

[22] A Bit About Us, WebArchive (last visited Nov. 12, 2024),
https://web.archive.org/web/20240718065432/https://www.nwpts.org/about.
[23] Program Offerings, WebArchive (last visited Nov. 12, 2024),
https://web.archive.org/web/20240621115734/https://www.nwpts.org/programs.
[24] Catalog 2022-2023 at 11, WebArchive (last visited Nov. 12, 2024),
https://web.archive.org/web/20240716154030/https://www.nwpts.org/_files/ugd/042f92_fc12a49
4d00e4e2b9f7ad394becbc9a5.pdf.
[25] *Id.*
[26] *Id.* at 15.
[27] *Id.*

BN 85820171v16

B.A. program, and one fully online course for its M.A. program, and two hybrid classes for its

B.A. program, and two hybrid course [*sic*] for its M.A. program. The hybrid classes have an in-

person attendance requirement, and attendance is required in Washington." (Chung Aff. (ECF

No. 54) at ¶ 7, (*High Expectations v. KPCA, et al*., No. 1:24-cv-11225 (D. Mass. filed Oct. 28,

2024).)

54.     According to KPCA, it charges an annual tuition of $4,800.00 minus alleged

scholarships it purportedly provides. (Chung Aff. at ¶ 8.)

55.     KPCA is a SEVP-certified school and eligible to enroll F-1 students in the U.S.

### iv.     *KPCA Recruits F-1 Students from Utah Using Their Website and a Network of Recruiters*

56.     KCPA operates two websites: www.nwpts.org and www.nwpts.info, both of

which are available in Utah.

57.     KPCA's website, www.nwpts.org, has been offline for unknown reasons since

approximately October 2024. This website allows F-1 students located in Utah—which are those

who are already attending a school in Utah—to download an admissions application to KPCA

and submit the admissions application via email. Attached hereto as Exhibit A is a copy of

KPCA's Application for Admission.

58.     In addition to allowing Utah-based F-1 students to apply online to transfer to

KPCA, KPCA has been soliciting F-1 students located in Utah—including F-1 students at U.S.

Ling—and regularly communicating with these prospective Utah-based students through the

telephone, text message, WhatsApp, and via e-mail.

59.     KPCA also uses a network of agents, including current F-1 students based in Utah, to recruit other Utah-based F-1 students, including those that were or currently are attending U.S. Ling.

### v.      *KPCA's Application Process and Program Offerings of Online Classes*

60.     As part of the F-1 student's admission package to KPCA, the Utah-based students must also pay KPCA a nonrefundable "processing fee" and a "shipping fee."

61.     In addition, F-1 students pay KPCA a non-refundable application fee of $400.00. F-1 students based in Utah have paid KPCA this $400.00 from Utah.

62.     For Utah-based F-1 students who are admitted to KPCA, KPCA provides the student a transfer form by e-mail. The student then submits the transfer form to their current Utah school (for example, U.S. Ling).

63.     Once a Utah-based F-1 student is admitted to KPCA, the Utah-based student sends funds directly to KPCA, including for admission and tuition.

64.     Utah-based F-1 student admitted to KPCA, can remain in Utah where they take KPCA's classes online.

65.     KPCA's classes for B.B.S. are primarily taught by KPCA in the Korean language. While KPCA reportedly offers classes in English, KPCA has added Portuguese subtitles for the Brazilian students it convinces to attend KPCA.

66.     KPCA does not require its F-1 students to attend online classes via Zoom, or any other platform that allows for synchronous streaming, and by which KPCA could ensure the students' attendance. Rather, KPCA provides its F-1 students 50-minute pre-recorded classes

BN 85820171v16

that students watch online at their leisure. The students are then expected to turn in a document at the end of each week summarizing the pre-recorded videos the students watched online.

67.     KPCA claims that its F-1 students must physically visit KPCA's campus located in Washington State <u>once</u> a semester. During this once-a-semester visit to campus, KPCA rents a banquet hall or large conference room in a nearby hotel, and conducts a church assembly where students pray.

68.     KPCA believes that the requirement that its students visit campus once a semester means that it is permitted to offer only online classes throughout the semester and thereby avoid the restrictions contained in 8 C.F.R. 214.2(f)(6)(i)(G).

69.     KPCA claims that as of June 24, 2024 it had 1,048 students enrolled, meaning it is earning $5,030,400.00 annually (minus scholarships, and costs associated with offering a 50-minute pre-recorded video offered online). Yet, Based on a review of Google Maps images, KPCA has a total of 14 parking spaces for over 1,048 students.

### vi.     *KPCA Has Solicited Thirty Seven U.S. Ling F-1 Students*

70.      In 2024, KPCA caused thirty seven F-1 students attending U.S. Ling in Utah, who are all Brazilian, to transfer to KPCA for biblical studies. Most of these students transferred from U.S. Ling collectively increasing the damage caused to U.S. Ling.

71.     Yet, none of these students transferring to KPCA are required to be physically present in Washington, where KPCA's campus is purportedly located.

72.     KPCA has no meaningful way to track the location or movement of these students. Indeed, because KPCA's classes are all offered online, the F-1 students can move

18

throughout the United States. As of June 2024, KPCA's F-1 students were apparently spread across twenty-three states, including Utah. (Chung Aff. at ¶ 18.)

73.     Moreover, all of these F-1 students who transferred to KPCA, affiliated with the Korean Presbyterian Church, to obtain a Bachelor's in Biblical Studies were previously attending U.S. Ling to learn English. None of the transferee students completed their English language curriculum and most still lack English language proficiency.

74.     On May 17, 2024, to allay concerns among KPCA's students that KPCA was putting its F-1 students' visa status in jeopardy by offering online classes, KPCA circulated a word document that purported to contain an email from an ICE agent (whose name was redacted) to KPCA providing clarification regarding "hybrid classes" (the "Chung Email"). A copy of the Chung Email is attached hereto as Exhibit B. The purported email from ICE to KPCA claims that KPCA's allegedly "hybrid classes" are permissible and may be counted towards the "full course of study" that is required for the F-1 students to maintain their duration of status. It is unclear whether the Chung Email is authentic.

75.     Upon information and belief, KPCA is aware that offering pre-recorded online classes is attractive to F-1 students because these students can (i) work the entirety of the day rather than physically attend classes—despite the fact that none of these F-1 students are entitled to a work permit; and (ii) students are not actually challenged to learn anything substantive.

76.     But by offering these pre-recorded online classes, which violate U.S. law (including the "full course of study" requirement contained in 8 C.F.R. 214.2(f)) KPCA is not only putting the visa status of hundreds, if not thousands, of students in jeopardy, but is also unlawfully interfering with U.S. Ling's contractual relations with its students.

**FIRST CAUSE OF ACTION**
**(Intentional Interference with Potential and Existing Economic Relations)**

77.    U.S. Ling realleges and incorporates by reference each of the preceding paragraphs.

78.    KPCA has intentionally interfered with U.S. Ling's existing and potential economic relations with its enrolled F-1 students.

79.    KPCA has interfered by using means that are improper and contrary to law, including misrepresenting to students that its online or "hybrid classes" are compliant with F-1 regulations, and violating U.S. statutes and regulations—such as 8 C.F.R. § 214.2—and established standards, practices, and customs of the education industry that accepts F-1 students.

80.    KPCA's interference has caused injury to U.S. Ling.

81.    As a result of KPCA's intentional interference through improper means it caused mass transfer outs from U.S. Ling. To date, thirty-seven U.S. Ling students, holding F-1 visas, have transferred to KPCA in 2024.

82.    KPCA's intentional interference through improper means has resulted in U.S. Ling suffering hundreds of thousands of dollars in lost revenue, which U.S. Ling estimates is approximately $400,000.00. In addition, U.S. Ling was forced to obtain a business loan, at high interest rates, to cover U.S. Ling's fall semester operating costs. Accordingly, U.S. Ling has been damaged as a result of KPCA's actions.

83.    U.S. Ling requests a monetary judgment in an amount to be determined at trial.

84.    U.S. Ling further requests a judgment enjoining KPCA from continuing to interfere, through improper means, with U.S. Ling's economic relations with its F-1 students.

## SECOND CAUSE OF ACTION
### (Common law unfair competition)

85.     U.S. Ling realleges and incorporates by reference each of the preceding paragraphs.

86.     KPCA and U.S. Ling are competitors in the market for F-1 students.

87.     KPCA has acted unfairly in competing against U.S. Ling.

88.     KPCA has made false representations and violated the law to induce F-1 students who are attending U.S. Ling to terminate their enrollment and transfer to KPCA.

89.     KPCA's false representations include that it is fully complying with U.S. regulations applicable to F-1 students, including 8 C.F.R. 214.2, and that students will maintain—and not jeopardize—their F-1 visa by attending KPCA and courses that is entirely, or almost entirely, online.

90.     KPCA's conduct has confused and misled F-1 students and caused dozens of students to terminate their relationship with U.S. Ling in favor of transferring to KPCA.

91.     As a result of KPCA's unfair competition, KPCA has harmed and injured U.S. Ling.

92.     U.S. Ling requests a monetary judgment in an amount to be determined at trial.

93.     U.S. Ling further requests a judgment enjoining KPCA from unfairly competing, as identified above.

## PRAYER FOR RELIEF

Plaintiff U.S. Ling requests judgment against Defendant KPCA as follows:

A.  On each cause of action, for the specific relief requested.

B.  Pre- and post-judgment interest, costs, and attorneys' fees.

C.  For such orders or other relief as the Court deems necessary, just, and proper.

### JURY DEMAND

U.S. Ling demands a trial by jury for all issues so triable.

DATED: December 9, 2024.

**BUCHALTER, A Professional Corporation**

*/s/ Zaven A. Sargsian*
Zaven A. Sargsian

*Attorney for Plaintiff*

BN 85820171v16